**STATE OF RHODE ISLAND and PROVIDENCE PLANTATIONS**

**DEPARTMENT OF EDUCATION**

**SPECIAL EDUCATION DUE PROCESS HEARING**

**STUDENT: JOHN DOE**

**SCHOOL DISTRICT: TOWN OF BARRINGTON**

**HEARING OFFICER: ARTHUR G. CAPALDI, ESQ.**
**1035 MAIN STREET**
**COVENTRY, R.I. 02816**

**ATTORNEY FOR SCHOOL DEPT: JOHN R. MAHONEY, ESQ.**
**155 SOUTH MAIN STREET**
**PROVIDENCE, RHODE ISLAND 02903-7115**

**STUDENT'S ATTORNEY: KATHLEEN M. HAGERTY, ESQ.**
**70 JEFFERSON BOULEVARD**
**WARWICK, RHODE ISLAND 02888**



"EXHIBIT A"

**STATE OF RHODE ISLAND and PROVIDENCE PLANTATIONS**

**DEPARTMENT OF EDUCATION**

**SEPCIAL EDUCATION DUE PROCESS HEARING**

**STUDENT:** MARK PAYTON

**SCHOOL DISTRICT:** TOWN OF BARRINGTON

**HEARING OFFICER:** ARTHUR G. CAPALDI, ESQ.
1035 MAIN STREET
COVENTRY, R.I. 02816

**ATTORNEY FOR SCHOOL DEPT:** JOHN R. MAHONEY, ESQ.
155 SOUTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02903-7115

**STUDENT'S ATTORNEY:** KATHLEEN M. HAGERTY, ESQ.
70 JEFFERSON BOULEVARD
WARWICK, RHODE ISLAND 02888

# LEXICON

For the purposes of the decision in the within hearing and to ensure confidentiality of the student, the following Lexicon shall be used in this decision:

**STUDENT:** **M. PAYTON**

**PARENTS:** **MICHAEL and KAREN PAYTON**

**SCHOOL DISTRICT:** **BARRINGTON SCHOOL DISTRICT**

**HEARING OFFICER:** **ARTHUR G. CAPALDI, ESQ.**

**ATTORNEY FOR SCHOOL DEPT.:** **JOHN R. MAHONEY, ESQ.**

**STUDENT'S ATTORNEY:** **KATHLEEN M. HAGERTY, ESQ.**

## POSITION OF PARTIES

**PARENT:**

The School District failed to provide the Student with a free, appropriate public education as required under the law.

The Placement within the School District was inappropriate because the Student failed to make meaningful progress in that placement.

The School District is required to pay the tuition at the Wolf School under the law and the Parents are entitled to reimbursement for tuition.

**SCHOOL DISTRICT:**

The School District proposed an IEP that would provide a free appropriate public education in that the Student would receive an educational benefit.

The Parents unilaterally removed the Student from the Public School even through the District offered an appropriate IEP.

The Student was receiving an educational benefit while attending Public School in the School District.

The School District is not responsible for the Tuition at the Wolf School nor for the reimbursement of tuition or costs paid by the Parents.

## ISSUES AND SUMMARY OF DECISION

**ISSUE:** Did the School District provide the Student with a free, appropriate public education while the Student attended the school in the District and did the School District offer a free, appropriate public education when it offered the IEP of 2004/2005?

(Is the School District responsible for the payment of the Student's tuition and

costs while attending the Wolf School?)

**SUMMARY OF DECISION:**

The School District did provide and did offer a free appropriate public education to the Student as required under the law.

The Parents are not entitled to reimbursement of tuition and costs of the Wolf School.

## TRAVEL OF THE CASE
**(June 19, 2007 to August 14, 2007)**

On June 19, 2007, this Hearing Officer was appointed to conduct a due process hearing in the above matter.

Notice of the appointment was sent to Susan Healy-Mills Director of Special Services, Barrington School District, Kathleen M. Hagerty, Esq., attorney for the Student and the Parents of the Student.

A prehearing conference took place on July 16, 2007 and dates were established for hearing.

The hearing began on July 25, 2007 and continued on August 1, 2, 3, 7 and concluded on August 14, 2007.

Parties wanted to submit briefs. None of the hearing transcripts were available at the conclusion of the hearings.

The hearing officer agreed to give the parties at least one week after the last transcript was received to prepare and submit briefs. The last transcript was received the week of August 20, 2007. Briefs were to be due on or before August 31, 2007. The decision due date

had to be extended to September 8, 2007.

On September 4, 2007, Ms. Hagerty, attorney for the Parents, sent an e-mail to this Hearing Officer concerning information obtained by her concerning the witness, Terry Harrison Goldman, which she claimed jeopardized the credibility of that Witness. Her e-mail was responded to by Mr. Mahoney, Attorney for the School District. Ms. Hagerty requested a subpoena to obtain further documents from the School District.

This Hearing Officer would not entertain such a request in as much as the hearing was closed and in fact, found Ms. Hagerty's communication setting forth facts she obtained after the close of evidence to be highly improper. This Hearing Officer would not consider facts not brought out at the hearing and not under oath.

Ms. Hagerty further communicated with this Hearing Officer on September 6, 2007, in which she stated that she did not have this information during the hearing process. However, this witness was not a surprise witness and she knew that Dr. Goldman was going to testify weeks before she testified. This information was available prior to Dr. Goldman's testimony.

However, in fairness to the Parents, this Hearing Officer reviewed Dr. Goldman's testimony of August 1, 2007 at page 46 and I do not find the testimony of Dr. Goldman to be in anyway contradictory to the alleged facts that were presented by Ms. Hagerty.

She was asked: "Have you ever been asked to come into a school and work with any student in the Barrington System?" She answered "No". This clearly means that she never actually went into a school building to work with a student.

Finally, she clearly admitted having worked with Barrington Students in the past. She was asked: "Have you ever worked with Barrington students in addition to (Student)?" She

said “Oh, Yes”. (Trans. August 1, 2007, P.46) A copy of the above mentioned communications are attached to this decision.

**FACTS**

The Student is eleven years four months old. The Student’s Parents noticed the Student was exhibiting behavior issues shortly after his second birthday (Trans. July 25, 2007 P. 5 L3). The Student was not speaking except for the ability to say “Dada” and “Dick” (Trans. July 25, 2007 P.5 L6)

The Student was evaluated at Meeting Street School in July of 1998 and he started speech therapy in 1998 at Paul Austin’s Speech and Audiology Department. He was around two years old. Early intervention turned him over to the School District’s special services when the Student was three years old (1999) (Trans. July 25, 2007 P.6 L7-23)

The Student went into special education preschool at Primrose Hill. They communicated with the Student by a picture system. (Trans. July 25, 2007 P. 7 L-10-24)

The Student received speech therapy and occupational therapy in the School District three individual sessions per week. (Trans. July 25, 2007 P. 8 L 11-24) The Student attended Primrose Hill five days a week and had an IEP for the 1999-2000 School year. The Student made progress the first year. Trans. July 25, 2007 P. 11 L 1-3) The Student’s IEP for 2000 to 2001 was identical to the 1999 to 2000 IEP (Trans. July 25, 2007 P. 12 L 1-2)

The Parents took the Student to Sargeant Rehab Center in May of 2001 for occupational therapy twice a week, year round, for over two years. (Trans. July 25, 2007 P. 14 L 3-14) The Student also had speech therapy at Sargeant Rehab.

When the Student was 6 years old his pediatrician, Dr. Dennision, referred the Student to Memorial Hospital of R.I. for a neurodevelopmental assessment.

The assessment of September 26, 2002 concluded that the Student's pattern of performance was consistent with Expressive and Receptive Language Disorder. Other findings were consistent with Global Apraxia which corresponded with the Student's previous diagnosis. His attention problems were consistent with Attention Deficit Hyperactivity Disorder – Combined Type and he exhibited many characteristics of dyslexia. (Plaintiff Exh. 30 – P.11)

The above assessment made several recommendations:

1. Continue with various medications.
2. The Student should receive the maximum amount of individual speech and language therapy available.
3. Reading and speech therapy should focus on strengthening the Student's auditory comprehension, auditory discrimination, phonological awareness.
4. Instruction should be provided in a multitude of avenues.
5. The professionals involved with treatment and education need to understand that the Student has complex needs.
6. The Student's motor planning problems require further consultation with occupational therapist.
7. Various recommendations to assist the Student with inattention, impulsivity and distractibility. (Plaintiff Exh. 30).

The IEP Team met on May 10, 2002 and June 13, 2002 to develop an IEP for May, 2002 to May, 2003 which IEP was accepted by the Parents. (Plaintiff Exh. 7)

In reading, the Student could variably identify the letters in his name but did not know upper or lower case letters of the alphabet. He could identify number 1-5. By June, 2003 the Student made progress in all areas of short term objectives.

The present level of performance in writing skills was that the Student could write his first name with verbal cues and clear boundaries and could trace his last name with cues. He could trace numbers 1-15 with verbal cues. By June, 2003 the Student attained the short term objective of being able to write his first and last name clearly and legibly with only verbal cues. The progress review showed progress in all the short term objectives.

In Math, at this time the Student could count from one to twelve and could identify the same numbers with cues.

By June, the Student could orally count up to 20 and made progress in the short term objectives set for him. In attention, the Student is shown to have made progress in all the short term goals set in the IEP.

In Speech and language, the Student then communicated using 4-7 word sentences which were often syntactically incomplete. The Student made progress in ten short term goals but in four short term goal areas, the progress review indicated "improving" or "not addressed".

The Student was in the regular education (Kindergarten) for a portion of the day and in self contained for other services for the remainder of the day.

In the area of Occupational Therapy, the present levels were described as follows: the Student has difficulty processing propriocystive input, and gross and fine motor planning are difficult for him. Tactile discrimination is also diminished.

There were no indications in the 4/02 to 5/03 IEP as to whether or not progress was made in the area of Occupational Therapy. (Plaintiff Exh. 7 P.14,15 & 16)

Marion Morey was the Student's Occupation Therapist in the 2002/2003 school year and she was his therapists in summer school at the Primrose School. The Student made progress in the short term objectives (Trans. Aug. 3, 2007 P.18 L 7-13)

The Therapist and Assistants would work with the Student on a pull out basis and while the Student was in the regular classroom and in the Special Education class. (Trans. Aug. 3, 2007 P.19 L-20-24, P.20 L. 7-23) The only goal in which there was no progress was shoe tying. It was the only one carried over into the 2003/2004 school year. (Trans. Aug. 3, 2007 P. 29 L11-17)

The IEP section that shows progress was blank. She testified that it would have been filled out at some point. (Trans. Aug. 3, 2007 P. 56-L-8) Mrs. Morey could testify as to progress during the 2002-2003 school year because she not only used memory but by reviewing the nest year short term goals she can determine the change. (Trans. Aug. 3, 2007 P. 53 L 18-24)

Claire Accardi was the Student's speech language therapist for the 2002/2003 school year.

The Student progressed in that year. She stated that the ability to understand the Student was better at the end of that school year than in the beginning. (Trans. Aug. 3, 2007 P. 17 L 19-24), P.21 L 12-24 and P.22 L 7-24) Progress was slow.

Doniell Westerman Remington was the Student's special education teacher. The Student was in regular education kindergarten from 8:15 to 11:00 A.M. At 11: A.M. the Student went into self contained classroom until the school day ended. (Trans. Aug. 14, 2007 P. 7 L 18-23) At the beginning of the 2002-2003 school year the Student could not read, did not know what letters were, did not know what numbers were and could not add or subtract. (Trans. Aug. 14, 2007 P. 12 & 13)

This witness confirmed that progress was made. (Trans. Aug. 14, 2007 P.23) The Student did attain some goals although very few. Trans. Aug. 14, 2007 P. 24 L 1-24) The Student was exposed to literature the entire day (Trans. Aug. 14, 2007 P. 25 L 18-24)

The Student may not have attained all the goals but he did make progress in reading, readiness, writing skills and math skills. (Trans. Aug. 14, 2007 P. 34 L 3-23)

In 2003, the Student attended Sowans Elementary School in the School District. It was his kindergarten year. (Plaintiff Exh. 31) On May 21, 2003, the Student was again evaluated at Memorial Hospital. The clinical psychologist, Terry Harrison-Goldman, noted that the Student made considerable progress in his ability to interact and communicate since the previous evaluation.

> "(The Student) has shown great improvement in his attentional regulation, social interaction and his language abilities" (Plaintiff Exh 31 P.2)

The recommendations from Memorial Hospital were:

1. Strongly recommended that the Student participate in the regular mainstream first grade class.
2. Reading should strengthen his phonological awareness.
3. The Student should not become overly dependant on the aide.

The Parents hired Memorial Hospital to perform the evaluations and Dr. Goldman worked for Memorial Hospital. The Purpose of the evaluations was to assist in recommendations for special services. (Trans. Aug. 1, 2007 P.6 L 7-15) In the last evaluation, Dr. Goldman made observations between what she was observing and what she observed in 2002.

> "The important ones for this part were that he had made amazing progress, considerable progress since the last time I saw him. He was able to come in and make very good eye contact. ……This isn't to say that he didn't still have communication issues but compared to the initial evaluation he – his

> sentence length, length of utterances was longer."
> (Trans. Aug. 14, 2007 P.26 L 11-18)

As to attention regulation, she testified that the Student had actually made decent progress and really showed a big improvement. (Trans. Aug. 14, 2007 P. 28 L 11-16) Dr. Goldman strongly recommended mainstreaming because the Student would benefit from learning from other kids that he was around and particularly in social situations. (Aug. 14, 2007 P. 29 L 13-16)

Significantly, this witness when asked her opinion regarding the 2003/2004 IEP as to whether the Student was being provided an appropriate education in Barrington, she stated:

> "Yes, I thought he was making progress and I thought
> the education program was appropriate".

The Student was receiving tutoring by Anna Johnson (Sussman) during 2003. When asked how that affected the Student's progress, Dr. Goldman said:

> " I didn't actually say that I thought that was the only
> thing that was providing progress. He also was
> on different medication and he was also getting
> older, so there are a lot of factors that play into
> where the progress was coming from"
> (Trans. Aug. 14, 2007 P. 48 L 22-24, P. 49 L 1 & 2)

Dr. Goldman recommended that the Student receive the maximum amount of individual speech and language therapy available and she testified that the School District was providing speech and language therapy for this student appropriately and in accordance with her recommendations. (Trans. Aug. 14, 2007 P. 59 L 1-24, P. 60 L 1-24, P. 61 L 1.24)

On June 18, 2003 there was another IEP meeting for the June, 2003 to June 2004 school year which was accepted by the Parents.

When comparing the present levels of performance in Reading, Written Language, Math, Attention/Academics Work, Behavior, Speech and Language and Occupational Therapy with the 2002/2003 IEP, there is considerable improvement. (Plaintiff Exh. 7 & 3). In reviewing pages 4, 5, 6, 7, 8, 9, 10, 11 and 12 of Plaintiff Exhibit 8, the Student made progress in twenty one areas and attained the goal in six areas.

The Student's teachers for the school year 2003/2004 were the same as those for the 2002/2003 school year, Claire Accardi (Speech & Language), Marion Morey (OT) and Doniell Remington (Special Education) all testified and confirmed that this Student made meaningful progress even though it was slow progress.

On June 14, 2004 an IEP for June, 2004 to June, 2005 was prepared by the School District but it was not accepted by the parents. In reviewing that 2004/2005 IEP it continued to incorporate the kind of Special Education Services that Dr. Goldman believed to be necessary for this Student.

Prior to September, 2004, the Parents unilaterally removed the Student from the School District and enrolled him at the Wolf School.

The Parents rejected the IEP for 2004/2005 because the Student was not reading and his speech was still not age appropriate. (Trans. July 25, 2007 P.41 L 15-18)

The Parents wanted reassurances that the School District could help the Student. (Trans. July 25, 2007 P. 51 L 15-17) In reviewing the communication log, Defendant's Exhibit 2, which ran from October 1`4, 2003 to May 20, 2004, there was never a request by the Parents for assurance of any kind. This log certainly demonstrates the good working relationship the Parents had with the Student's teachers.

Dr. David Urion presented the most recent evaluation of the Student which was conducted on February 15, 2007 at the Children's Hospital in Boston. The evaluation summary in regard to academics stated:

> "Given the particularities (Student) presentation, we would endorse a substantially separate self contained, high individualized therapeutic milieu as the placement which (Student) requires based upon the above noted findings.. (Student) has a relatively unusual neurobehavioral disorder and one which requires the simultaneous and integrated provision of therapeutic services within the context of academics. In addition to this, given his rather substantial cognitive and academic needs, his services must be provided in a fairly intensive fashion."

Dr. Urion has outstanding credentials and he testified on August 8, 2007.

The Student in Dr. Urion's opinion falls on the more severe end of the disorder spectrum. (Trans. Aug. 8, 2007 P. 9 L 4) The purpose of the evaluation was to determine progress the Student was making in context of the schooling the Student was presently receiving and to make recommendations. (Trans. Aug 8, 2007 P. 10)

The recommendation was as follows:

> "The recommendation from the team was for a highly specialized academic environment in which large elements of therapies could be embedded within the context of daily instruction, and intensive therapies to remediate the ongoing motor planning, speech, language, etc. difficulties are included in an intensive fashion in the course of his academic week, and the difficulties that he has dealing with multiple simultaneous demands which is another important part of the disorder be taken into account."

Dr. Urion testified that the Student's placement at Wolf School fulfilled the criteria outlined in his evaluation. As to his opinion concerning placement he stated:

> " I think on the basis of our evaluation we can talk about type of placement that we think would likely be most useful or beneficial"

Dr. Urion could not give an opinion concerning the appropriateness of the Barrington School District's IEP for this Student.

The Parents had several teachers from the Wolf School testify about the School and the Student.

Anna Johnson, Classroom Teacher, Jessica Robins Miller, Head of Wolf School, Jennifer Valios, Teacher and Meredith Maxwell Kenash, Speech Pathologist all testified. The one fact common to all those who testified including the School District's witnesses is that this Student's ability to progress is painfully slow.

As of Dr. Urion's evaluation of February 15, 2007, the Student still had significant deficits and still could not read. The report states:

> "Overall (the Student) shows a profound disorder of praxis within the context of his language and this can be seen both at the level of pronunciation, as well as synthesis in other settings. In addition to this disorder of praxis this shows rather profound deficits in retrieval, formulation, and morphosynthetic function. This in turn compromises his writing and reading abilities."

**DECISION**

**ISSUE:** Did the Barrington School District provide and offer a free, appropriate public education to the Student?

Was the proposed June, 2004 to June, 2005 IEP (Plaintiff Exhibit 9) appropriate in that, did it provide the Student with a Free Appropriate Public Education? We shall review

and determine first, whether the procedures mandated under the IDEA have been met and second, is the IEP of 2004/2005 reasonably calculated to enable the Student to receive educational benefit. Board of Education of Hendrick Hudson Central School District, Weschester County et al v. Rowley 48 U.S. 176, 102 S. Ct. 30 34 (30501)

The facts clearly show that the Parents diligently participated in the IEP process. They had attorney Tabor participate in the 2003 – 2004 IEP and the Parent was present during the IEP Meeting of June 14, 2004.

Based upon the facts above stated, I find that the School District did not violate any of the procedural requirements of the Regulations.

In an Administrative Hearing challenging an IEP, the burden of proof is placed upon the party seeking relief. Schaffer v. Weast, 546 U.S. 49 (U.S. 2005)

The issue can also be stated as: Are the Parents entitled to reimbursement for cost of tuition and transportation for the unilateral placement of the Student at the Wolf School from September, 2004 to the present.

Section 300.402 (c) and (d) of the Regulations Governing the Education of Children With Disabilities states:

> (c) If the Parents of a child with a disability, who previously received special education and related services under the authority of a LEA, enroll the child in a private preschool, elementary, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the Parents for the cost of that enrollment if the court or hearing officer finds that the LEA had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate. A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs.
>
> (d) The cost of reimbursement may be denied if:
> At the most recent IEP meeting that the Parents attended prior to

> removal of the child from the public school, the Parents did not inform the IEP team that they were rejecting the placements proposed by the LEA to provide FAPE to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
> at least ten (10) business days business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the Parents did not give written notice to the LEA of the information described in paragraph (d) (1(i) of this section;
> if, prior to the Parents' removal of the child from the public school, the LEA informed the Parents, through the notice requirements described in Part E of these regulations, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the Parents did not make the child available for the evaluation; or
> upon a judicial finding of unreasonableness with respect to actions taken by the Parents.

The law under the IDEA reauthorization of 2004, is basically the same. In general, it does not require reimbursement by the School District if a free appropriate public education was made available and the Parents elected to place the Child in a private school or placement. Reimbursement is allowed if the School District had not made a free appropriate public education available to the child in a timely manner prior to enrollment but this reimbursement is limited if the Parents did not inform the IEP meeting prior to removal that they rejected the IEP and were rejecting the placement proposed by the School District or prior to removal the Parents failed to give Ten (10) days written notice of the removal.

The notice requirement was not presented as an issue by the School District. Therefore, the notice requirement shall be considered to have been properly given.

In Burlington School Committee of the Town of Burlington, Massachusetts vs. Department of Education of the Commonwealth of Massachusetts, 471 U.S. 359, 85L. Ed. 2d 385 (1985), an early case concerning reimbursement the Court held:

> ...The grant of authority includes the power to order school authorities to reimburse Parents for their expenditures on private education for a child

> if the Court ultimately determines that such placement rather than the proposed IEP is proper under the Act.

That case also held that for reimbursement the proposed placement by the School District had to be inappropriate and the private placement was proper.

> "If the Court ultimately determines that the IEP proposed by the school officials was appropriate, the Parents would be barred from obtaining reimbursement for any interim period in which their Child's placement violated section 1415 (d)(3). This conclusion is supported by the agency's interpretation of the Act's application to private placements by Parents:
> (a) If a handicapped child has available a free appropriate public education and Parents choose to place the Child in a private school or facility the public agency is not required by this part to pay for the child's education at the private school or facility…"
> Burlington School 471 U.S. 359

What is a free appropriate public education?

> "A free appropriate public education consists of education instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from instruction. Board of Education of Hendrick Hudson Central School District Westchester County et al v. Rowley 458 U.S. 176, 1982 at 189.

Implicit in the congressional purpose of providing access to a free appropriate public education is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. Rowley 458 U.S. at 200

The Court Concluded:

> "We therefore conclude that the basic floor of

> opportunity provided by Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Rowley 458 U.S. at 201

Related services are described in Rowley as speech pathology and audiology, psychological services, physical and occupational therapy, recreation and medical and counseling services except that such medical services shall be for diagnostic and evaluation purposes only.

The Court in Rowley addressed the intent of the IDEA. It said:

> "Thus the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside: Rowley 458 U.S. at 192)

As to educating handicapped children with nonhandicapped children Rowley held:

> "The Act requires participating States to educate handicapped children with non-handicapped children whenever possible. When that mainsteaming preference of the Act has been met and a child is being educated in the regular classroom of a public school system the system itself monitors the educational progress of the child." Rowley 458 U.S. at 203

Finally, the Court addressed the issue of choosing educational method:

> "The primary responsibility for formulating the education to be accorded a handicapped child and for choosing the educational method most suitable to the child's needs was left by the Act to State and Local educational agencies in cooperation with the Parents or guardian of the Child." Rowley U.S. 458 at 207

The Parent testified that there was no progress made by the Student under the 2003/2004 IEP and that the fact that so few goals were actually achieved is evidence of the lack of progress and lack of educational benefit. The Parent testified that she wanted her child to read and that no one in the School District would give her assurances as to when there would be a break through for her child. She also believed that the Wolf School Methodolgy was better than that of the Public School. Certainly, we can all understand the frustration that these Parents had to endure. Dr. Urion places this Student on the severe end of the spectrum of his disability. (Trans. Aug. 1, 2007 P. 9 L 13-15) The facts clearly show that gains are made almost at a snail pace with this Student.

Every witness that worked with the Student testified that progress was very, very slow and that his achievements were not consistent.

The Parent felt that the Tutor's program for reading using the Telian program made more sense to them rather than the Foundation program being used at school. The Parent asked the Special Education teacher, Ms. Remington (Westerman) to stop using the Foundation Program. (Trans. July 25, 2007 P. 25 L 11-17, P. 27 L 5 – 8)

However, the law requires the School District or rather, the teacher to select the methodology.

The Parents were not satisfied with the Student's progress for the 2002/2003 and 2003/2004 school years. The Parents rejected the 2004/2005 IEP because:

> "Because the Student was still not reading, his speech was still not age appropriate and I thought he needed a more intensive program to get him to read and to speak age appropriately" (Trans. July 25, 2007 P. 41 L 14 – 18)

The Parents selected the Wolf School because their methods were very different from what the Student had in the Public School. (Trans. July 25, 2007, P. 41 L 21-24)

It is the Parents right to seek an educational method they believe to be best for their child outside the District but if the School District is offering FAPE then the Parents have to financially support such a decision.

How could the School District or any of its teachers give the parents any assurances as to when he would be able to read? The facts show that after three years of intensive schooling at the Wolf School, the Student still is not reading beyond late kindergarten according to Dr. Urion's report. (Plaintiff Exh. 6 – Written Language Section under Oral & Written Language)

That report addressed his reading ability. It stated:

> "Although Mark's teachers report that he is reading at an early first grade level, we administered an informal letter identification task prior to the reading portion of the evaluation.
> ...(The Student) had difficulty accurately and automatically identifying some lower case and upper case letters..... (The Student's) performance on this task suggests that his ability to identify letters is not secure nor is it automatic for him" (Plaintiff Exh. 6)

The IEP has to provide the Student with an educational benefit. Academic progress is an important factor in determining whether a student is receiving an educational benefit. Adam J. ex rel. Robert J.V. Keller Indept. Sch. Dist 328F 3d. 804 (5th Cir. 200)

The Parents argue that because many of the short term goals were not attained there was a lack of educational benefit.

The law does not set attainment as the criteria for "educational benefit."

The intent of the IDEA as stated in Rowley is to open the door of public education rather than to guarantee any particular level of education. Did this child benefit from the educational programs for the 2002/2003 and 2003/2004 school years and was the 2005/2005 IEP designed to fulfill the requirements of the law?

In carefully reviewing the testimony of Dr. Urion, he was able to describe the kind of placement that the Student currently needed. It did describe the Student's present placement at the Wolf School. He stated:

> "The present placement was the one that fulfilled the criteria…that we outlined in the context of our evaluation." (Trans. Aug. 1, 2007 P.19 L 14-16)

However, I find that his description of the placement for this Student was that of a placement that would provide an optimal educational benefit. Dr. Urion testified as follows:

> "… We can talk about type of placement that we think would be likely to be the most useful or beneficial."

The law does not require the IEP to provide the most useful or most beneficial.

On the other hand, Dr. Terry Harrision-Goldman specifically referred to the Student's education within the District and her opinion was that the education program for 2003/2004 school year was appropriate and that the Student made progress. (Trans. Aug. 1, 2007 P. 47 L 15-16)

Dr. Goldman while employed by Memorial Hospital had the best view as an independent examiner to determine whether or not the Student made progress from Sept., 2002 to April, 2004. It should be noted that the Parents hired Memorial Hospital to perform these evaluations. In May of 2003, she observed that the Student made considerable progress from the last evaluation in 2002 in his ability to interact and communicate with her. In Dr.

Goldman's report of April 28, 2004 she saw further progress in the Student's ability to interact and communicate with her. She used the words "considerable" and "significant" to describe e the progress made. (Plaintiff Exh. 30, 31 & 32)

In Dr. Goldman's initial report, she recommended that the Student be given the "maximum" amount of individual speech and language therapy available. On cross examination she was asked if the School District complied with her recommendation. She stated that what the School District provided was on the lower limit of the maximum amount. (Trans. Aug. 1, 2007 P. 59, 60, 61)

From the Facts above mentioned and the applicable law, I find that the Student did receive an educational benefit in the 2002/2003 and 2003/2004 school years. I find that the proposed 2004/2005 IEP did offer the Student a free appropriate public education.

Having found that the IEP for 2004/2005 was appropriate, there is no need to discuss whether or not the Wolf School is an appropriate placement.

The Parents request for reimbursement for Tuition and Costs at the Wolf School is hereby denied.

DATE: September 10, 2004

Arthur G. Capaldi
Hearing Officer
1035 Main Street
Coventry, RI 02816
821-3537

-----Original Message-----
From: Kathleen M. Hagerty [mailto:khagerty2@cox.net]
Sent: Thursday, September 06, 2007 7:33 AM
To: arthur capaldi
Cc: jackmahoney@amlawllp.com
Subject: Re: Read: MP v. Barrington School District

Dear Hearing Officer Capaldi,
I did not have this information during the course of the hearing and therefore was unable to present it to you. I disclosed the information I learned immediately to you and Mr. Mahoney via email. Further, I requested your approval to issue subpoaenaes to obtain information in the possession and control of the Town of Barrington to either prove or disprove what was told to me. I felt I had a duty to disclose what I had been told and an obligation on behalf of my client to determine the truth. I respectfully disagree that my email was "highly inappropriate". Please note my objection to your decision to disregard and not allow further investigation into this newly discovered possible evidence. Thank you for time and consideration.
Very truly yours,
Kathleen M. Hagerty, Esq.

----- Original Message -----
From: "arthur capaldi" <agc@cblaw.necoxmail.com>
To: "'Kathleen M. Hagerty'" <khagerty2@cox.net>
Cc: <jackmahoney@amlaw.com>
Sent: Wednesday, September 05, 2007 4:23 PM
Subject: RE: Read: MP v. Barrington School District

> DEAR MS. HAGERTY
>
> I READ YOUR E-MAIL OF SEPTEMBER 4, 2007 AND MR. MAHONEY'S
> RESPONSE. I DO FIND YOUR E-MAIL TO BE HIGHLY INAPROPRATE. SUCH MATTERS
> SHOULD BE PRESENTED DURING THE HEARING SO THAT THE HEARING OFFICER HAS THE
> ABILITY TO MAKE A FAIR JUDGEMENT CONCERNING THE WITNESSES CHARACTER. YOU
> HAVE ATTEMPTED TO PRESENT FACTS TO ME NOT UNDER OATH AND AFTER THE HEARING
> IS CLOSED. I AM UNABLE AND WILL NOT CONSIDER THE FACTS PRESENTED IN YOUR
> E-MAIL IN DECIDING THIS MATTER.
>
> VERY TRULY YOURS,
>
> ARTHUR G. CAPALDI,
> ESQ.
>
>
> -----Original Message-----
> From: Kathleen M. Hagerty [mailto:khagerty2@cox.net]
> Sent: Tuesday, September 04, 2007 12:13 PM
> To: arthur capaldi
> Cc: jackmahoney@amlaw.com
> Subject: Re: Read: MP v. Barrington School District
>
> Dear Mr. Capaldi
> I want to inform you that a Nancy Gladney who works for the Barrington
> School Department has confirmed that Terry Harrison Goldman has done

> neuropsych evaluations at the request of the Town Of Barrington on
> students
> for them and that she has been compensated directly by the Barrington
> School
> District for this service. You may recall that in her testimony when
> asked
> if she has any "affiliation or connection with the Barringtron School
> Department" she replied "no" (Tr. p. 46). I do not believe she was
> truthful
> at the hearing and would ask for an inquiry into how often she was
> referred
> work and compensated by the Town of Barrington. This is obviously
> relevent
> to and should ber considered in determining her bias. I believe her
> testimony was not truthful and was an attempt to engratiate herself with
> the
> powers that be within the school district to assure her future referrals
> and
> thereby monetary gain. I would like to subpoena any and all evidence of
> payments made by the Town of Barrington to this witness or her employers.
> Please advise. Thank you.
> Kathleen M. Hagerty
> ---- arthur capaldi <agc@cblaw.necoxmail.com> wrote:
>> Your message
>>
>> To: agc@cblaw.necoxmail.com
>> Subject: MP v. Barrington School District
>> Sent: 8/31/2007 4:45 PM
>>
>> was read on 9/4/2007 9:54 AM.
>
> --
> Kathleen M. Hagerty, Esq.
> Flaherty & Lawrence
> 70 Jefferson Boulevard
> Warwick, RI 02888
> Tel: (401) 781-7200
> Fax: (401) 781-0110
>
> No virus found in this incoming message.
> Checked by AVG Free Edition.
> Version: 7.5.485 / Virus Database: 269.13.5/988 - Release Date: 9/4/2007
> 9:14 AM
>
>
> No virus found in this outgoing message.
> Checked by AVG Free Edition.
> Version: 7.5.485 / Virus Database: 269.13.6/991 - Release Date: 9/5/2007
> 2:55 PM
>
>
>

No virus found in this incoming message.
Checked by AVG Free Edition.

Version: 7.5.485 / Virus Database: 269.13.6/991 - Release Date: 9/5/2007 2:55 PM

SEP 6 2007

ASQUITH & MAHONEY, LLP
ATTORNEYS AT LAW

HARRY W. ASQUITH, JR.
JOHN R. MAHONEY
ELIZABETH P. SANTILLI*
DENISE LOMBARDO MYERS †
JOHN W. MAHONEY

HARRY W. ASQUITH
1919-1998

* ALSO MASSACHUSETTS BAR
† ALSO CONNECTICUT BAR

September 5, 2007

Arthur G. Capaldi, Esq.
1035 Main Street
Coventry, RI 02816
Fax No.: (401) 821-9697
agc@cblaw.necoxmail.com

RE: MP
VS: BARRINGTON SCHOOL DEPARTMENT
CASE NO: 07-19

Dear Hearing Officer Capaldi:

I have now read Attorney Hagerty's e-mail to you dated September 4, 2007. This ex-parte communication to you is legally offensive to me on two different levels.

First, I know enough not to call Mr. or Mrs. Payton while this case is pending. Why petitioner's counsel feels it is appropriate to talk to Town of Barrington School Department personnel, without my knowledge, is bewildering. More importantly, this communication violates professional conduct rules which we lawyers are supposed to adhere to.

The communication is also most inappropriate because both parties were given liberal amounts of time to produce any witnesses in the direct claim, defense or in rebuttal. The parties were given appropriate time to provide legal memorandum to argue their client's position. To communicate with you on an ex-parte basis concerning blatant hearsay regarding collateral matters of impeachment is unfair and unprofessional.

I take it that the ex-parte communication will be given the weight it deserves and that we will anticipate receiving a decision from you shortly. Kindest regards.

Very truly yours,

John R. Mahoney, Esq.

JRM:las

cc: Kathleen M. Hagerty, Esq.
70 Jefferson Boulevard
Warwick, RI 02888
Fax No.: (401) 781-0110
khagerty2@cox.net

**FLAHERTY & LAWRENCE**

COUNSELLORS AT LAW

70 JEFFERSON BOULEVARD
WARWICK, RHODE ISLAND 02888

TELEPHONE (401) 781-7200 TELECOPIER (401) 781-0110

September 5, 2007

VIA FACSIMILE ONLY– (401) 331-7373
John R. Mahoney, Esq.
Asquith & Mahoney, LLP
155 South Main Street
Providence, RI 02903-7115

Re: M.P. v. Barrington School Department
Case No.: 07-19

Dear Mr. Mahoney:

An ex parte communication is a phrase that generally refers to action taken without notice to the adverse party. That is clearly not what occurred here. I cc'd you on the e-mail that I sent to Hearing Officer Capaldi. I note that your letter of September 5, 2007 does not deny that Terry Harrison Goldman ever received referrals from and did evaluations on students for the Barrington School Department.

It is my hope, if this is true, that you were unaware at the time you asked Ms. Harrison Goldman if she has any "affiliation or connection with the Barrington School Department" and she answered "no" that she was not being truthful. If Ms. Harrison Goldman was not truthful and chose to conceal evidence of a bias toward the school department for reasons of her own pecuniary gain I am entitled to that information.

Further, you claim in your brief that "Dr. Terry Harrison-Goldman was the most compelling witness in this case. This conclusion is drawn not because of any fault or deficiency in any of the other witnesses who testified but rather because Dr. Goldman was the most disinterested (emphasis added) and informed witness of anyone who testified at the hearing." (Respondent's brief p. 17)

By this letter, I renew my request that this matter be fully investigated before any decision is rendered. The Barrington School District has not been honest and forthright in its dealings in this matter. You may recall that the District was ordered to provide me a copy of Ms. Accardi's file and claimed that they had when in reality they picked and chose what they would produce. It was only after I set forth the specific documents I had seen that there was a supplemental production that included not only the documents I referenced but others as well. There was no explanation by you on behalf of the School District as to why they were not initially produced when ordered by the Hearing Officer to be provided.

John R. Mahoney, Esq.
September 5, 2007
Page 2

I have every right to bring this information to the attention of the hearing officer and would in fact be remiss in my obligations to my client to ignore it.

In closing, if my e-mail of September 4, 2007 to Hearing Officer Capaldi can be considered an ex parte communication then so too would be your September 5, 2007 letter to him.

Very truly yours,

Kathleen M. Hagerty, Esq.

KMH/jae
cc: Arthur G. Capaldi, Esq. -- Via Facsimile Only - (401) 821-9697